UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: CLINTON CARE CENTER, LLC,
a/k/a CARE CENTER OF CLINTON, LLC

CASE NO. 08-11722-DWH
CHAPTER 11

OPINION

On consideration before the court is an application for the approval of an administrative expense claim filed by John W. Jamison, III, ("Jamison"); an objection to said application having been filed by Trinity Therapy Services, Inc., ("Trinity"); and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. This is a core contested proceeding as defined in 28 U.S.C. §157(b)(2)(A), (B), and (O).

II.

On May 1, 2008, CareCorps Management Co., LLC, and twelve of its affiliates, including the debtor herein, Clinton Care Center, LLC, a/k/a Care Center of Clinton, LLC, ("debtor"), filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. A consolidated plan of reorganization for the parent and the affiliated entities was confirmed by an order of this court entered December 17, 2009, pursuant to which Jamison, who owns 100% of the debtor, was appointed as the debtor's Liquidation Agent.

III.

On July 1, 1999, the debtor, as lessee, entered into a lease agreement with Jamison, as lessor, for the use and occupancy of a 121 bed nursing home facility located in Clinton, Mississippi. The lease agreement was for a five year primary term which terminated on June 30, 2004. A copy of the lease agreement was received in evidence as debtor's Exhibit 1. At the expiration of the original term of the lease, the parties mutually agreed to continue the lease on a month to month basis. This continued subsequent to the filing of the debtor's Chapter 11 bankruptcy petition even though the lease agreement was never officially assumed by the debtor. On January 28, 2009, Jamison attempted to terminate the lease effective February 28, 2009, but, since he had not obtained relief from the automatic stay, his notice of termination was not initially allowed. Following the filing of an appropriate motion seeking relief, this court lifted the automatic stay, and the lease agreement was terminated effective March 31, 2009. *See*, 89-7-23, Miss. Code Ann. (A one week notice is sufficient to terminate a month to month lease.) The debtor paid Jamison all the rent that was due through the date of termination.

IV.

CareCorps Management Co., LLC, and the affiliated entities, including the debtor, formulated a plan of reorganization which envisioned a substantive consolidation scheme. Seven of the affiliated entities were grouped collectively as the "Consolidated Debtors"; five other entities, including CareCorps Management Co., LLC, were grouped collectively as the "Liquidated Debtors"; and the debtor herein, Clinton Care Center, LLC, remained alone. Jamison objected to this plan, contending that it artificially separated the debtor from the other

entities solely because of the large administrative expense claim that he held against the debtor as a result of obligations arising out of the aforementioned lease agreement.

After extensive negotiations, on April 26, 2010, Jamison, individually; the Liquidation Agent of the Consolidated Debtors; the Liquidation Agent of the Liquidated Debtors; and Jamison, as the Liquidation Agent of the debtor; filed a motion to approve a compromise. This resolved Jamison's objection to the confirmation of the plan, and among other things, provided that Jamison would be allowed to file in the debtor's case an administrative expense claim in an amount not to exceed $250,000.00. As a part of this agreement, the consolidated debtors, the oversight committee, and the individual members of the committee agreed not to object to Jamison's reduced $250,000.00 claim. This settlement permitted the consolidated plan to be confirmed which contained the substantive consolidation scheme outlined hereinabove.

In keeping with the settlement, Jamison filed his administrative expense claim in the debtor's bankruptcy case for the sum of $250,000.00. It has drawn the objection of Trinity, a party which was not precluded from filing an objection by the compromise. The debtor has approximately $214,581.00 on hand, which is all that is available for distribution to the creditors of the debtor's estate. The distribution of these funds must be consistent with the priority scheme outlined in the Bankruptcy Code.

V.

Since the rental obligations were fully paid pursuant to the terms of the lease agreement, Jamison's administrative expense claim is based first on certain repair obligations that were incumbent upon the debtor as lessee under the agreement, and then second as a result of certain Mississippi Division of Medicaid bed tax obligations that might be owed by the debtor.

Section 5.01 of the lease agreement entitled "Maintenance" provides as follows:

    (a) Lessee accepts the Leased Property in the physical condition or state in which the Leased Property now is held without any representation or warranty, express or implied in fact or by law, by Lessor and without recourse to Lessor as to the physical nature, condition or usability thereof.

    (b) Except for Lessor's obligation as herein set out, the Lessor shall not be required to furnish any services or facilities of whatsoever nature or to make any repairs or alterations or whatever nature in or to the Leased Property. Lessee hereby assumes the full and sole responsibility for the condition of the Leased Property.

    (c) Lessee, at its sole cost and expense, shall maintain in good condition and order and take good care of the Leased Property, shall make all repairs thereto, interior and exterior, structural and non-structural, ordinary and extraordinary, foreseen and unforseen and shall maintain and keep the Leased Property and the sidewalks, paved area, roof and curbs in good order.

Jamison's original claim for the repair obligations totaled $1,061,957.67. It was reflected on a Bid Memo prepared by Ron Kimbrough Construction, Inc., and received in evidence as Jamison Exhibit 2. The appropriateness of this "estimation" will be discussed in greater detail hereinbelow. While the court will comment on and consider the total amount of each item in the Bid Memo, Jamison's claim will be capped in the sum of $250,000.00 pursuant to his earlier agreement.

VI.

The underpinnings of the Medicaid bed taxes are also murky. On Jamison's Exhibit 4, the debtor's bankruptcy schedules, the Mississippi Division of Medicaid is listed as <u>unsecured priority</u> creditor on Schedule E for "provider taxes" incurred during the pre-petition period of February, 2008, through April 30, 2008, in the total sum of $84,096.93. Jamison indicated that the total bed taxes are $183,271.83. Ironically, the Division of Medicaid filed a proof of claim as

an <u>unsecured/non-priority creditor</u> in the total sum of $531,820.12, which includes bed taxes of $173,663.43. (This latter number is $9,604.41 less than the amount asserted by Jamison).

Why Medicaid has designated its claim as unsecured/non-priority has not been explained. Usually, a claim such as this would be designated as a priority claim which would be superior to the claims of general unsecured creditors, but subordinate to administrative expense claims. Before this court will permit any distribution of the debtor's funds, this matter will have to be clarified.

VII.

Jamison contends that since the lease was renewed on a month to month basis after the expiration of the primary term and since this practice continued after the debtor filed its bankruptcy case that all of the attendant leasehold obligations incumbent upon the debtor were renewed each thirty day period. Because of this, Jamison further asserts that any unperformed obligations under the lease would be considered post-petition obligations, and, therefore, elevated to an administrative expense priority. In an effort not to belabor this point, the court would simply state that it does not buy this argument at all. Even though the lease agreement was renewed on a month to month basis, it is still one continuous contract. *See, Williams v. Barlow*, 38 So.2d 914 (Miss. 1949), and *In re Miller*, 282 F.3d 874, 877-78 (6th Cir. 2002). Common sense dictates that most of the obligations that are subject to Jamison's claim did not accrue completely in the last thirty day renewal period of the lease. They accrued over the entire time that the premises was occupied by the debtor. For purposes of practicality, the debtor's occupancy of the premises can be broken down into the following two periods:

1. Pre-petition period prior to the debtor's bankruptcy filing: The five-year primary term of the lease plus a period of three years and ten months during which the lease was renewed on a month to month basis. This last time frame runs from June 30, 2004, until May 1, 2008.

2. The post-petition period following the debtor's bankruptcy filing: This is an eleven month time frame running from May 1, 2008, through March 31, 2009, the date of the lease termination.

During both of the aforementioned periods, the court will not lose sight of the fact that Jamison was the 100% owner of the debtor, and, at the same time, was the lessor owner of the leased premises. He obviously controlled the timing and the extent of any repair or maintenance undertakings.

Jamison has taken the extreme position in this proceeding that the debtor assumed the lease agreement every month post-petition. In fact, the debtor never asked this court to approve the assumption of the lease. The only action relevant to either assuming or extending the lease, taken during the administration of the bankruptcy cases, was the filing of motions to extend the time period within which the debtor could make an election to either assume or reject the lease. Had the debtor assumed the lease, it would have had to timely cure any existing defaults in the lease provisions. See, §365(b)(1)(A) of the Bankruptcy Code. The failure to subsequently cure these defaults could have elevated a claim related thereto to an administrative expense priority. See, §503(b)(7) of the Bankruptcy Code. This latter section actually limits the amount of the administrative expense claim and requires an assumption of the lease followed by a post-petition rejection. This, however, is not an issue in this proceeding since there was never an assumption.

Jamison relies upon §365(d)(3) of the Bankruptcy Code and has cited the case of *CHS Electronics, Inc.*, 265 B.R. 339 (Bankr. S.D. Fla. 2001), where the court commented as follows:

>Based upon a plain reading of §365(d)(3), this Court agrees with and adopts the interpretation of a majority of courts which have held that nonresidential landlords are entitled to administrative expense priority for postpetition rent under an unexpired lease of nonresidential real property, without regard to §503(b)(1). *See In re Pacific-Atlantic Trading Co.*, 27 F.3d 401, 404-05 (9th cir. 1994); *In re Kirsch*, 242 B.R. 77, 79 (Bankr. M.D. Fla. 1999); *In re Florida Lifestyle Apparel, Inc.*, 221 B.R. 897, 901 (Bankr. M.D. Fla. 1997). Neither legislative history nor general bankruptcy policy permits a court to deviate from following specific Congressional dictates contained in clear provisions of the Bankruptcy Code. *See In re Yates Development, Inc.*, 256 F.3d 1285 (11th Cir. 2001). Thus, in the instant case, the Landlord must simply prove that the Lease was unexpired during the sixty day postpetition period to establish its right to an administrative expense under §365(d)(3).

*Id.* at 341-42.

Jamison's reliance on §365(d)(3) is a reaction to Trinity's argument that a creditor seeking an administrative expense claim must establish that the claim is for the actual, necessary costs and expenses of preserving the estate. *See, Matter of TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992). While Jamison's argument is technically correct in a limited context, the *CHS Electronics* opinion that he relies upon supports the position that a landlord is entitled to an administrative expense claim for the unpaid post-petition rents related to the tenant's occupancy of the premises prior to an unexpired lease being rejected. In fact, Trinity does not object to that part of Jamison's claim that is related to the debtor's post-petition occupancy of the premises.

The court, therefore, must look at the nature of the expenses being claimed by Jamison to make a determination as to whether these expenses relate to the debtor's use of the premises post-petition. The court will make this determination based on a pro rata assessment of the expenses that would be applicable to the eleven month post-petition period. That portion of the

expenses which would be attributable to the pre-petition period is entitled only to an unsecured non-priority status.

The total time that the debtor occupied the leased premises was one hundred seventeen months. One hundred six months occurred pre-petition and eleven months occurred post-petition. Therefore, the percentage of post-petition occupancy is 9.4%. Because the court has little else with which to work, it will utilize this percentage factor in calculating Jamison's allowable administrative expense claim.

## VIII.

The Bid Memo submitted as Jamison's Exhibit 2, reflects the expenses that would be necessary to completely restore, refurbish, and correct deficiencies related to the nursing home facility. These numbers are just estimates, and several of the underlying tasks have not yet been performed. Jamison asserts that each of these items is an obligation of the debtor required by §5.01(c) of the lease agreement, which essentially provides that the lessee shall "maintain in good condition and order and take good care of the Leased Property, shall make all repairs thereto, interior and exterior, structural and non-structural, ordinary and extraordinary, foreseen and unforeseen and shall maintain and keep the leased property and the sidewalks, paved area, roof and curbs in good order." As noted hereinabove, the court has already rejected Jamison's argument that all of these expenses should be considered as occurring post-petition. The court further rejects Jamison's position that all of the Bid Memo expenses are required by Section 5.01(c) of the lease agreement. By necessity, the court will address each of the items as they appear in the Bid Memo, as follows:

1. The first three items relate to the installation of 107 windows, including tax and labor, in the total sum of $67,255.00. (Although it is insignificant, the court notes that the tax is actually miscalculated; it should be $4,066.00, as opposed to $4,660.00.) - In the absence of a suitable explanation, the court is of the opinion that this is not a repair or maintenance item. It is the installation of 107 new windows. In the opinion of the court, an expense of this nature is beyond the scope of the maintenance provision in the lease agreement. An appropriate repair or maintenance obligation would be the replacement of a broken window, not the complete replacement of all windows in the building. Jamison's request to have this part of his claim treated as an administrative expense is unreasonable, and it will be disallowed by the court in its entirety.

2. The installation of 650 feet of base and synthetic handrail in the total sum of $10,920.00 - The court will allow 9.4% of this amount as an administrative expense claim in the sum of $1,026.48. The balance is an unsecured pre-petition claim.

3. Repair walls, prime and paint 52 patient rooms at the rate of $875.00 per room for a total sum of $45,500.00 - The court will allow 9.4% of this amount as an administrative expense claim in the sum of $4,277.00. The balance is an unsecured pre-petition claim.

4. Rebuild two nurses stations with the installation of new electrical and granite counter tops in the total sum of $8,600.00 - The court will allow 9.4% of this amount as an administrative expense claim in the sum of $808.40. The balance is an unsecured pre-petition claim.

5.   The installation of 52 new fire rated doors due to rusting at $689.00 each for a total sum of $35,828.00 - Because Jamison testified that the rusting problem was caused by roof leaks, the court will allow a pro-rated administrative expense claim in the sum of $3,367.83, and an unsecured pre-petition claim in the sum of $32,460.17.

6.   Repair parking lot, re-pave and re-stripe for the total sum of $98,854.00 - The court will allow 9.4% of this amount as an administrative expense claim in the sum of $9,292.28. The balance is an unsecured pre-petition claim.

7.   Point up brick on outside of building for the total sum of $4,275.00 - The court will allow 9.4% of this amount as an administrative expense claim in the sum of $401.85. The balance is an unsecured pre-petition claim.

8.   Remove and replace washers and dryers with new ones for the total sum of $65,667.05 - The court is of the opinion that it is not the responsibility of the lessee to replace items of equipment at the conclusion of a lease agreement which has run a total of 117 months. This is a cost that must be borne by the owner of the equipment. Ordinary wear is anticipated. This item is denied in its entirety.

9.   Replace dropped ceiling panels with new ones for the total sum of $41,629.00 - In the absence of an explanation for the need of new dropped ceiling panels, the court denies this claim in its entirety.

10.   Install new roof and gutters for the total sum of $114,000.00 - Jamison indicated that this is one item that has actually been completed for the total sum of $99,000.00. He shared the expense with the new tenant and, consequently, actually paid the sum of $49,500.00. While the court certainly understands that repairs to the roof would be considered a reasonable expense

to the debtor as lessee, a complete roof replacement goes beyond what is contemplated in the repair and maintenance section of the lease agreement. As such, this claim is denied in its entirety.

11. Paint halls, closets, kitchen, and dining room for the total sum of $36,231.43 - The court will allow 9.4% of this amount as an administrative expense claim in the sum of $3,405.75. The balance is an unsecured pre-petition claim.

12. Repair sewer drains and necessary plumbing which required the removal of the concrete flooring for the total sum of $55,192.66 - While repairs to the sewer drains and the plumbing would ordinarily be considered a maintenance item, the testimony from a previous hearing indicated that some of the work associated with this item was a structural problem that originated when the facility was initially constructed. While structural repairs are obviously contemplated within the scope of the lease agreement, work undertaken to remedy an innate construction defect, in the opinion of this court, goes beyond the repair and maintenance obligations that would be the responsibility of a lessee. Since there was no breakdown of this particular amount, the court is left with no choice but to disallow this claim in its entirety.

13. Install new flooring in the sum of $90,833.34 - A lease agreement anticipates ordinary wear and tear to the premise flooring. Consequently, a lessee is not generally required to replace the flooring at the conclusion of a lease unless there were circumstances involving unusual damage to the flooring. Since there was no testimony to this effect, the court has no choice but to deny this claim in its entirety.

14. Replace whirlpool tub in the sum of $10,724.62 - Without some explanation, this item is identical to the item requesting the replacement of all washers and dryers. A repair and

maintenance provision in a lease agreement does not contemplate that a lessee is to replace an item of equipment such as this with a new model unless there has been some extraordinary damage to the equipment. Consequently, this item is denied in its entirety.

15. Generator replacement including auto transfer switches in the sum of $19,464.02 - Although Jamison testified that this was just the installation costs, this item is identical to the other items of equipment and it is denied in its entirety.

16. Foundation repairs where the foundation must be dug up and hydraulic jacks installed and concrete footers poured in the sum of $74,983.05 - This item is similar to the sewer drains and appears to be a defect related to the original construction of the premises. This is not an expense that should be borne by a lessee and it is denied in its entirety.

17. Replacement of furniture, fixtures, and equipment in the total sum of $151,250.00 - A lessee is simply not required to provide a lessor with new furniture, fixtures, and equipment at the conclusion of a lease term unless the circumstances are extraordinary. This item is like the other items requesting the replacement of used equipment with new equipment. It will be denied in its entirety.

18. Remove old landscaping and install new landscaping, including shrubs, sod, topsoil, and mulch as needed in the sum of $24,974.50 - The installation of new landscaping, etc., is not in the nature of repairs or maintenance. It is a discretionary item that must be borne by the lessor. This item is denied in its entirety.

19. Remove and replace HVAC units in patient rooms with new ones in the sum of $90,407.00. This is identical to the replacement of used equipment with new equipment. This item is denied in its entirety.

20. The removal and installation of new roof HVAC units in the sum of $15,369.00. This is identical to the replacement of used equipment with new equipment. This item is denied in its entirety.

For the most part, the bulk of Jamison's request for an administrative expense claim has been disallowed by the court because the items do not constitute repairs and expenses that would reasonably be within the scope of the lease agreement provision. The items that are legitimate repairs and maintenance will be separated into an administrative expense portion and an unsecured portion for the balance. The administrative expense portion of these items reasonably relates to the debtor's "holdover" use and occupancy of the premises. The balance is applicable to the debtor's prepetition occupancy of the premises.

In summary, the court allows Jamison's claim in the following amounts:

| Item | Administrative Expense | Unsecured Claim |
| --- | --- | --- |
| Base and handrail ($10,920.00) | $ 1,026.48 | $ 9,893.52 |
| Repair walls and paint patient rooms ($45,500.00) | 4,277.00 | 41,223.00 |
| Repair doors | 3,367.83 | 32,460.17 |
| Rebuild two nurses stations ($8,600.00) | 808.40 | 7,791.60 |
| Repair parking lot ($98,854.00) | 9,292.28 | 89,561.72 |

| | | |
|---|---|---|
| Brick point up ($ 4,275.00) | 401.85 | 3,873.15 |
| Paint halls, etc. ($36,231.43) | 3,405.75 | 32,825.68 |
| Totals | $22,579.59 | $217,628.84 |

A separate order will be entered consistent with this opinion.

This the 20th day of July, 2010.

*/s/ David W. Houston, III*
DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE